O'Kelly W. Myers v. Commissioner.
O'Kelly v. Commissioner
Docket No. 15234.
United States Tax Court
1949 Tax Ct. Memo LEXIS 204; 8 T.C.M. (CCH) 391; T.C.M. (RIA) 49099; April 28, 1949
Albert J. Fleischmann, Esq., and William Taft Feldman, Esq., both of Fidelity Bldg., Baltimore, Md., for the petitioner. James C. Maddox, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of a deficiency of $4,827.28 for 1943. A negligence penalty of 5 percent, in the amount of $241.36, is also asserted. The sole question is whether petitioner was a bona fide resident of New Providence Island, British West Indies, during the entire taxable year 1943, within the meaning of Internal Revenue Code, section 116 (a). Findings of Fact Petitioner now resides at East New Market, Maryland. The return for the period here involved *205 was filed with the collector for the fourteenth district of New York. For many years prior to 1942 petitioner was employed as a senior engineer with the Board of Water Supply of New York City. His salary was $6,500 per annum. Petitioner graduated in civil engineering in 1899; he was with the United States Engineers from 1900 to 1907; he worked on the construction of Hudson River tubes from 1907 to 1909; he was in the Army in World War I; he worked on various fortification work in North Carolina and at Fortress Monroe, Virginia. Petitioner owned a home in Pleasantville, New York, in which he resided until he was transferred, in about 1936, by the Board of Water Supply, to Newburgh, New York. He rented his Pleasantville home and lived for five or six years in Cornwall, a country place about seven miles outside of Newburgh. In the spring of 1942 petitioner rented a house in Newburgh and gave up his country residence. The lease for the house in Newburgh was for one year, expiring the end of April, 1943. Petitioner's family who were living in the houses at Cornwall and Newburgh consisted of his wife, Marie B. Myers, his daughter, Lucy Myers, and his wife's mother. Early in 1942 petitioner *206 requested and obtained leave of absence from the Board of Water Supply to do engineering work on a project in Puerto Rico. In May, 1942, petitioner accepted employment as chief engineer on a construction project of the Pleasantville Constructors, Inc., for work on the Island of New Providence, Bahamas. Petitioner requested and obtained a leave of absence without pay from the Board of Water Supply in order to accept this employment. Petitioner left Newburgh May 18, 1942. Pleasantville Constructors, Inc., were engaged in the construction of airfields for the British Government in Nassau. Petitioner's first written contract of employment was executed after his arrival in Nassau on May 19, 1942. The contract provided, inter alia: "ARTICLE I. This Agreement of Employment is made by the Constructor pursuant to a contract No. W-1098 Eng. 1350 between the United States of America and the Constructor for certain work and services on the Island of New Providence, Bahamas, and elsewhere, and is, in all respects, subject to provisions of said Contract and the reasonable requirements and interpretations thereof, and the services of the Employee shall be rendered in the Bahamas and elsewhere *207 and other places to which the Constructor may send the Employee. "ARTICLE II. * * * "The Employee agrees that he will continue in the employment of the Constructor at the site of the work for as long a period as the Constructor desires his services on the construction not exceeding a maximum of six months, with the understanding, however, that the Constructor may terminate such employment with or without cause at any time. * * *
"ARTICLE IV. As consideration for the services rendered by the Employee, the Constructor agrees to pay said Employee's salary in U.S. Currency, or its equivalent, partly on the site to the Employee and the balance by deposit in a United States bank. Salary will be paid from the time the Employee reports for duty at the place designated by the Constructor. "The Constructor has made arrangements with the bank or trust company below stated for the opening of an account in the name of the Employee. The Constructor will deposit in such account such part of the Employee's salary as is not paid at the site of the work. The Employee may control such account by documents prepared for that purpose which must be signed by the Employee before leaving the United *208 States. The Employee shall sign the payroll or other proper receipt which in each instance shall evidence receipt in full for all claims to the end of the weekly period. Without specific consent of the Constructor, the payment to the Employee on the site shall not exceed the amount per week stated below. * * *
"ARTICLE VI. The Constructor agrees to furnish the Employee transportation and meals while enroute in accordance with regulations prescribed by the Army Officer in charge, from the point of employment specified below to the site of the Construction Project, and likewise return transportation, including meals from the Construction Project to such point of employment provided the Employee remains at work as long as desired by the Constructor, or as specified in ARTICLE II hereof. "ARTICLE VII. While this agreement is in effect, the Constructor shall, at or near the site of the work to be performed, supply food and lodging if desired by the Employee, at a fixed charge of $10.00 per week, and the Employee agrees that, in the event that he avails himself of the food and lodging offered, the charge for the same may be deducted from his salary or wages at the site. "ARTICLE *209 VIII. If the Employee becomes ill or disabled during his employment on the site and if the doctor in charge deems that he is unable to perform his duties, or upon termination of this Agreement by the Constructor (unless terminated for breach thereof by the Employee, or for causes beyond the control of the Constructor as described in this Article), the Employee is to be returned to the point of employment specified below and the Constructor shall pay the return transportation and subsistence thereto; provided, however, that if the return of the Employee is prevented by causes beyond the control of the Constructor and not due to the fault of the Employee, the employment of the Employee shall thereupon be deemed terminated, but the Constructor will in lieu and in full of all obligations to the Employee under this Agreement pay to the Employee weekly (or as soon as practicable) an amount equal to the weekly salary provided for herein during the continuance of such prevention period, but such weekly payments shall not exceed $5,000 in the aggregate; provided, further, that if the Employee would as to such prevention period be entitled to benefits under any Workmen's Compensation Law or *210 Employers' Liability Law in excess of said weekly payments the Constructor will make payments in the amount of such excess. * * * "ARTICLE XVII. If the Employee * * * is incapacitated from carrying on his normal work by reason of intoxication, use of drugs or other act of misconduct or is insubordinate or fails or neglects to properly carry on his work or becomes for any reason obnoxious to the officers of the U.S. Army in charge of the work or to local authorities, this Agreement and the employment of the Employee may be canceled by the Constructor and the Constructor's obligation to the Employee, except to return him to the place of employment, shall thereupon cease and it shall be under no further obligation to him." * * *
Article XX stated that the salary to be paid was $230 per week; that the point of employment was New York, and that the Depository under Article IV was the First National Bank, Miami, Florida. Similar agreements or extensions thereof were executed January 29, 1943, May 29, 1943, and September 29, 1943. In the ones dated January 29, 1943, and May 29, 1943, petitioner agreed to work for so long as the constructor desired his services "not exceeding *211 a maximum of four months, with the understanding, however, that the Constructor may terminate such employment with or without cause at any time." The extension dated September 29, 1943, was for a maximum of 90 days from that date. Periodic extensions of petitioner's leaves of absence without pay were made by the Board of Water Supply. On December 28, 1943, petitioner received a letter from the Board of Water Supply advising him that their action dispensing with his services as of the close of business December 31, 1943, was rescinded due to his retirement effective November 9, 1943. As of the latter date, petitioner retired and became eligible for retirement payment of $1,826 a year during his life. Petitioner had secured forms and information necessary for applying for retirement in the spring of 1943, and filed his application for retirement on October 4, 1943. Petitioner went to Nassau on a passport which expired November 13, 1942, and which stated that it was not "valid for travel in any country except: the Bahamas defense work." The passport was extended successively to expire May 13, 1943; September 25, 1943; December 17, 1943; January 21, 1944; and May 13, 1944. These extensions *212 all carried the notation "the Bahamas defense work," quoted above from the original authorization. On January 6, 1944, another extension was granted to May 13, 1944, which for the first time bore the notation "Nassau, the Bahamas - Personal Business." The passport advised petitioner that if he made his home or resided abroad for a prolonged period he should register at the nearest American consulate. Upon petitioner's arrival in Nassau in May, 1942, he met Harold G. Christie, a real estate dealer, who was also connected with Sir Harry Oakes and the Nassau Engineering Co. Arrangements were made with Christie to furnish Pleasantville Constructors, Inc., with surveying parties, draftsmen, surveying instruments and office equipment, including blueprinting machines and drafting tables. Petitioner and Christie were in close contact with each other, and petitioner became informed of Christie's business interests and plans. Christie, the Nassau Engineering Co., and Christie's associates, including a promoter in England, were interested in the development of a tract of land on New Providence Island. Petitioner became interested in employment by the Nassau Engineering Company to commence upon *213 completion of the work in which petitioner was then engaged for the Pleasantville Constructors, Inc. It was proposed that petitioner was to receive $6,000 a year, living accommodations on the tract of land to be developed, and the right to engage in outside employment as an engineering consultant. Petitioner went on the payroll of the Nassau Engineering Company on December 20, 1943, and continued to March 20, 1944, when the arrangement was terminated by mutual consent. It was decided it was not advantageous, at that time, to invest the money necessary to begin the development, as the equipment and labor required could not be obtained due to other activities which were going on on the island at that time. He received $50 a week during this period. Immediately upon the termination of this engagement petitioner and his family returned to the United States, and have not since been to Nassau. Sir Harry died in 1943; his estate was represented by Christie. The work contemplated by the Nassau Engineering Company covered the development of several thousand acres of land, its water supply, sewage, and electrical systems, an inside harbor for small boats, roads, golf course, and subdivision *214 of the property. It was estimated that the expense would run into several million dollars, and that the work would extend over a period of several years. It was to be a continuous operation. At first, a part of the area would be developed, and a few houses built and put out for sale. When the sales were made, and the demand grew, additional tracts would be opened. The property was remote and not accessible during the war due to a shortage of gasoline. When petitioner first arrived in Nassau in May of 1942, he lived at the British Colonaial Hotel with the other personnel employed by Pleasantville Constructors, Inc., as permitted in his employment agreement. He continued there until his wife arrived on November 15, 1942, and returned there on December 15, 1942, after his wife returned to the United States. He remained at the British Colonial Hotel until February, 1943, when his wife returned to Nassau. While his wife was visiting him between November 15 and December 15, 1942, they lived in a furnished apartment or rooms, being part of a hotel operated by Mrs. Lofthouse. When petitioner's wife returned to Nassau in February, 1943, they occupied a two-bedroom, furnished house on a month-to-month *215 basis. This place was in the rear of the apartment where they had stayed in November and December, 1942. It had not been in use except for the storage of furniture due to the lack of demand occasioned by the war. Mrs. Lofthouse let petitioner's wife select her things and cleaned the house before she returned in February. It was adjacent to the hotel operated by Mrs. Lofthouse. They remained in this furnished house until July, 1943, and against returned to it on January 4, 1944. In July of 1943, they moved to a four-bedroom, furnished house known as "Charlotte Court,"owned by Mrs. Small. This was under a lease dated August 4, 1943, which ran from that date to January 4, 1944. The lease was executed on behalf of the owner by Christie as agent. Petitioner was the lessee designated therein as "of Newburgh, New York." They were permitted to take the property for the period of the lease due to wartime conditions. Christie informed them later that Mrs. Small wanted to occupy her own home. Petitioner was agreeable to giving up the home and moving to property secured by Christie which was known as "Four Steps Up." When they took this property it was understood that they would vacate at the *216 end of the term which was stated to be from December 1, 1943, to January 4, 1944. The lease designated petitioner as "at present of Nassau * * *." The furnishings of the houses included linen and silver. War travel restrictions practically eliminated the tourist and winter colony trade. After petitioner went to Nassau in May of 1942, his wife, daughter, and mother-in-law lived in the rented home in Newburgh until his wife returned to Nassau in February, 1943. His mother-in-law at about that time went to live with his wife's sister whom she was in the habit of visiting at least twice a year, and particularly when petitioner was going abroad. From February to March 27, 1943, petitioner's daughter lived in this house. Sometime during the period between March 22, 1943, and March 27, 1943, petitioner was at the house, closing it. He stored his furniture and the family's personal effects and property, except for some of their clothing which they took to Nassau with them. While petitioner was in New York at this time he placed his Pleasantville home in the hands of real estate dealers in Pleasantville. After being in the hands of four or five such dealers the property was ultimately *217 sold in 1945. He subleased the Newburgh houses through a real estate agent for the unexpired term of his lease ending May 1, 1943. Petitioner's wife did not have much of her clothing with her when she went to Nassau so the daughter, Lucy, selected certain of her mother's clothing to take to her mother in Nassau, and stored the rest. Petitioner's automobile was stored with a daughter and remained so until petitioner returned to the United States in March of 1944. Lucy resigned her position as a buyer in a department store in Newburgh for which she was receiving $22.50 per week, and returned with petitioner to Nassau. Lucy was planning to be married. She was prohibited from holding a position while in Nassau. Petitioner's wife liked the climate, the people and the living conditions in Nassau. Food was plentiful and servants were cheap. Petitioner and his family participated in the social life of Nassau; they were not invited to take part in the Red Cross or such activities; they did not engage in church activity in Newburgh or Nassau; they made friends in Nassau; they were entertained by the Duke and Duchess of Windsor at Government House. Petitioner made a study of the available water *218 supply on the Island of New Providence, with permission of Pleasantville Constructors, Inc. This was at the request of the Government through Christie. Petitioner also made two reports, one of which was in writing, dated January 1, 1944, for individuals in connection with beach erosion. Petitioner's departure from and arrivals at Miami, Florida, during his stay in the Bahama Islands were as follows: Departures from Miami
Arrivals at Miami
May 19, 1942
October 24, 1942
October 31, 1942
March 22, 1943
* March 27, 1943
May 5, 1943
May 7, 1943
June 16, 1943
June 17, 1943
***
July 20, 1943
** July 23, 1943
August 17, 1943
August 21, 1943
January 4, 1944
January 7, 1944
March 20, 1944
Bank accounts were maintained by petitioner in Newburgh, New York, and Miami, Florida. The account was closed in Newburgh when petitioner subleased the house there and stored his furniture. The second, with the First National Bank of Miami, was closed out two or three months after he returned to the United States on March 20, 1944. Petitioner *219 has always maintained a safe deposit box in the bank in Newburgh, New York. He has named this bank executor in his will and given them a copy of the will. In a letter, dated February 18, 1945, to a deputy collector of Internal Revenue, relating to a return which the collector had filed for 1943, petitioner stated: "I went to Nassau in 1942 presumably for a short period which was extended due to additional work authorization. While there in early 1943 I arranged to become associated with a local firm upon completion of my assignment and moved my family to Nassau with intention of becoming a permanent resident there." He also stated that he returned to the United States when the proposed work could not be financed. Petitioner's 1942 income tax return was filed in the fourteenth New York district, showing an address of "21 Leroy Place, Newburgh, New York, at present c/o Postmaster A.P.O. 618, Miami, Florida." This return showed petitioner's wife and mother-in-law as dependents, and in Schedule D stated "Residence for 12 mos. at 21 Leroy Place, Newburgh, New York." The return was dated February 28, 1943. Petitioner was not a bona fide resident of New Providence Island, British West *220 Indies, during the entire taxable year 1943. An attorney employed by Pleasantville Constructors, Inc., told petitioner that he was not taxable on his 1943 incomereceived from that company. The omission of the income received by petitioner from Pleasantville Constructors, Inc; was not due to neglect or intentional disregard of rules and regulations. Respondent's notice of deficiency to petitioner stated: "The provisions of Section 116 (a) (1) of the Internal Revenue Code do not apply in respect to income received in 1943 from Pleasantville Constructors Inc. for services rendered in Nassau, Bahamas. It is held that the said income is subject to Federal income tax." Opinion The documentary evidence tends to furnish a more satisfactory showing than the unsupported memory of witnesses as to when petitioner could have reached any intent to make Nassau his place of residence. His income tax return filed the end of February, 1943, gives his place of residence for the whole year 1942 as Newburgh, New York. In a letter written several years closer to the events he advised a deputy collector that in "early 1943," he moved his family to Nassau with the intention *221 of permanent residence. Both of these statements accord with his conduct in returning to the United States in March, 1943, for the purpose of disposing of his property in Pleasantville, New York, closing his rented house in Newburgh, and arranging for the care of his belongings and transporting personal effects to Nassau. It was also in early 1943 and not in 1942 that petitioner's daughter gave up her job in the United States and that petitioner took steps to effectuate his retirement from employment by the New York City Board of Water Supply. On this and similar evidence, coupled with petitioner's burden of proof, we have found as a fact that if petitioner was a bona fide resident of Nassau he was not such for the entire taxable year 1943. See Michael Downs, 7 T.C. 1053, affirmed (C.C.A., 9th Cir.), 166 Fed. (2d) 504, certiorari denied, 334 U.S. 832; Arthur J. H. Johnson, 7 T.C. 1040. This finding disposes of the principal issue, since the statute as applicable to the instant year contains the requirement that in order to avail himself of the exclusion permitted by section 116 (a), the taxpayer must be "a bona fide resident of *222 a foreign country or countries during the entire taxable year." [1]
Respondent proposed in addition a 5 percent negligence penalty. In view of the fact that the taxable year 1943 was the first to which the provision in question was applicable, that the regulations were changed to take account of the amended requirement while petitioner was physically absent *223 from the country, [2] and that he returned permanently to the United States after the date fixed for the filing of income tax returns for the year in question, we are unable to charge petitioner with "intention disregard of rules and regulations." [3] For similar reasons, coupled with the advice of an attorney retained by his employer and presumably familiar with the employment relationships of those in petitioner's position, we think petitioner has overcome the imputation of "neglect." See William H. Gross, 7 T.C. 837. The imposition of the negligence penalty is accordingly disapproved.
Decision will be entered under Rule 50. Footnotes
*. Accompanied by daughter Lucy. ↩
***. Accompanied by wife.↩
**. Accompanied by wife and daughter Ann. ↩
1. Internal Revenue Code, section 116 (a): "(a) Earned Income From Sources Without the United States - "(1) Foreign Resident For Entire Taxable Year. - In the case of an individual citizen of the United States, who establishes to the satisfaction of the Commissioner that he is a bona fide resident of a foreign country or countries during the entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts would constitute earned income as defined in section 25 (a) if received from sources within the United States; but such individual shall not be allowed as a deduction from his gross income any deduction properly allocable to or chargeable against amounts excluded from gross income under this subsection."↩
2. Filed with Federal Register March 10, 1943. ↩
3. "SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. "(a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without ntent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency * * *."↩